IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

_____

APPEAL NO. 24-10006-D

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

DAVID RIDLING,

Defendant-Appellant.

_____

APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE MIDDLE DISTRICT OF FLORIDA

_____

INITIAL BRIEF OF APPELLANT

_____

MICHELLE R. YARD, BCS
Joshi Law Firm, P.A.
Fla. Bar No. 14085
5750 Major Blvd, Suite 530
Orlando, FL 32819
Telephone: (407) 661-1109
Email: michelle@joshi.law
Counsel for Appellant

**Appeal No. 24-10006-D**

***United States of America v. David Ridling***

<u>**CERTIFICATE OF INTERESTED PERSONS**</u>

The persons listed below have an interest in the outcome of this case:

AgAmerica Lending, LLC

Andrejko, Nicole M.

Bratt, Chauncey Arthur

Byron, Honorable Paul G.

Cakmis, Rosemary

Corrigan, Honorable Timothy J., United States District Judge

Elm, Donna Lee

Eutzler, Matthew E.

Farm Credit of Florida

Federal Bureau of Investigations

Gershow, Holly Lynn

Hall, Alec Fitzgerald, Federal Public Defender for the MDFL

Handberg, III, Roger Bernard

Heritage Bank

Hoffman, Honorable Leslie R.

**Appeal No. 24-10006-D**

*United States of America v. David Ridling*

<u>**CERTIFICATE OF INTERESTED PERSONS, cont.**</u>

Hoppmann, Karin

Howard Fertilizer

Kahn, Conrad B.

Kelly, Honorable Gregory J.

Kidd, Honorable Embry J.

Lopez, Maria Chapa

LSBH, LLC

Lukman, Joshua Roy

Medico, Samantha

Muldrow, W. Stephen

Nutrien Ag Solutions, Inc. (f/k/a Crop Production Services, Inc.)

Patrick, Cheryl

Rabo Agrifinance, LLC

Rhodes, David P., Assistant United States Attorney

Ridling, David John

Riedel, Amanda Lynn

*United States of America v. David Ridling*

## <u>CERTIFICATE OF INTERESTED PERSONS, cont.</u>

Ryan, Michael Shay

Seacoast Bank

Seaside National Bank and Trust, acquired by United Community Bank

Seider, Germaine

Skuthan, James T.

Sports Fain P.C.

Travelers Insurance (ticker symbol: TRV)

Yard, Michelle R.

No publicly traded company or corporation has an interest in the outcome of this appeal.

## STATEMENT REGARDING ORAL ARGUMENT

Mr. David Ridling respectfully requests oral argument. It is submitted that argument by counsel familiar with the issue, facts, and record on appeal will provide this Honorable Court with assistance in resolving this case.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS...................................................... C1

STATEMENT REGARDING ORAL ARGUMENT....................................................i

TABLE OF AUTHORITIES..............................................................................iv

STATEMENT OF SUBJECT-MATTER AND APPELLATE JURISDICTION............viii

STATEMENT OF THE ISSUES ........................................................................1

    I.   Whether the district court committed reversible error by using "intended loss" to determine "loss" for purposes of the Guideline calculation under U.S.S.G. § 2B1.1.........................................................1

    II.  Whether the district court committed reversible error by determining the "intended loss" to be more than $25 million for purposes of the Guideline calculation under U.S.S.G. § 2B1.1.............1

STATEMENT OF THE CASE..............................................................................1

    I.   Course of Proceedings ..................................................................1

    II.  Statement of the Facts ..................................................................3

        A.  Personal Background ..............................................................3

        B.  Facts of the Offense...............................................................3

        C.  The Plea.................................................................................6

        D.  The Presentence Investigation ...............................................6

        E.  The Resentencing Hearing.....................................................7

III.   Standards of Review ................................................................ 19

SUMMARY OF THE ARGUMENTS .................................................... 20

ARGUMENTS AND CITATIONS OF AUTHORITY .............................. 21

    I.   The district court committed reversible error by using "intended loss" to determine "loss" for purposes of Mr. Ridling's Guideline calculation under § 2B1.1 ................................................. 21

      a.   The Commentary to U.S.S.G. § 2B1.1 Improperly Expands the Interpretation of its Unambiguous Sentencing Guideline to include "Intended Loss" as a Metric ............................... 23

      b.   The Commentary to U.S.S.G. § 2B1.1 is Not a Reasonable Interpretation of the Guideline ....................................... 38

    II.   The district court committed reversible error in calculating the "intended loss" total to be more than $25 million under U.S.S.G. § 2B1.1. ................................................................... 40

CONCLUSION ............................................................................. 46

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT ......... 47

CERTIFICATE OF SERVICE ........................................................ 47

# TABLE OF AUTHORITIES

## Cases

*Auer v. Robbins*, 519 U.S. 452 (1997) ...................................................... 25

*Bowles v. Seminole Rock*, 325 U.S. 410 (1945) ....................................... 25

*Hill v. Kemp*, 833 F.2d 927 (11th Cir. 1987) .......................................... 41

\*Kisor v. Wilkie*, 139 S. Ct. 2400 (2019)
..... ……………………………………24,25, 26, 27, 28, 34, 35, 36, 37, 38, 39

\*Stinson v. United States*, 508 U.S. 36 (1993) .... 24, 25, 27, 29, 33, 35, 36

*United States v. Acuna-Reyna*, 677 F.3d 1282 (11th Cir. 2012) ............. 19

*United States v. Banks*, 55 F.4d 246 (3d Cir. 2022) ................... 37, 38, 39

*United States v. Campbell*, 765 F.3d 1291 (11th Cir. 2014) ................... 20

*United States v. Corker*, No. 22-10192, 2023 WL 1777195
(11th Cir. Feb. 6, 2023) .............................................................. 10

*United States v. David Ridling*, USCA Case No. 21-10777 (11th Cir.) ... 2

*United States v. Dupree*, 57 F.4th 1269 (11th Cir. 2023) ........... 35, 36, 39

*United States v. Ethridge*, 948 F.2d 1215 (11th Cir. 1991) ................... 41

*United States v. Greene*, 279 F. App'x 902 (11th Cir. 2008) ................. 50

*United States v. Havis*, 927 F.3d 382 (6th Cir. 2019) ...................... 27, 29

*United States v. Hill*, 42 F.3d 914 (5th Cir. 1995) ................................ 45

*United States v. Kirilyuk*, 29 F.4th 1128 (9th Cir. 2022) ...................... 30

*United States v. Liss*, 265 F.3d 1220 (11th Cir. 2021)............................50

*United States v. Manatau*, 647 F.3d 1048 (10th Cir. 2011) ..................14

*United States v. Mandhai*, 375 F.3d 1243 (11th Cir. 2004) ..................19

*United States v. Moss*, 34 F.4th 1176 (11th Cir. 2022)..........................10

*United States v. Nasir*, 17 F.4th 459 (3rd Cir. 2021) ........................27, 34

*United States v. Patel*, No. 19-CR-80181-RAR, 2023 WL 5453747 (S.D. Fla. Aug. 23, 2023) ....................................................................9, 38

*United States v. Riccardi*, 989 F.3d 476 (6th Cir. 2021) . ................................................................25, 27, 29, 30, 34

*United States v. Rodriguez*, 751 F.3d 1244 (11th Cir. 2014)..................22

*United States v. Tatum*, 138 F.3d 1344 (11th Cir. 1998) ......................43

*United States v. Tedder*, 81 F.3d 549 (5th Cir. 1996)............................45

*United States v. Tejas*, 868 F.3d 1242 (11th Cir. 2017) ..........................33

*United States v. Washington*, 714 F.3d 1358 (11th Cir. 2013) .........20, 22

*United States v. Winstead*, 890 F.3d 1082 (D.C. Cir. 2018)....................33

**Statutes**

18 U.S.C. § 3231 ................................................................................vi

18 U.S.C. § 3553(a) ......................................................................8, 18

18 U.S.C. § 3553(b)(1)......................................................................29

18 U.S.C. § 3742 ...............................................................................vi

28 U.S.C. § 1291 ...............................................................................vi

28 U.S.C. § 994(a)(1), (b)(1)............................................................29

**Other Authorities**

U.S.S.C. Amendment 792..............................................................14, 23

U.S.S.C. Amendment 821....................................................................18

Application Note 4 of § 2B1.1............................................................33

Application Note 3 of § 2B1.1..............................................24, 28, 29

The Sentencing Reform Act of 1984....................................................29

*U.S.S.G. § 2B1.1...................................................................................
  1, 2, 6, 8, 9, 14, 20, 21, 22, 23, 24, 27, 29, 31, 32, 33, 35, 36, 37, 38, 39, 40

U.S.S.G. § 2B1.1 cmt. (n.3(A))..................................................22, 24, 28

U.S.S.G. § 2B1.1 cmt. (n.3(A)(i)) ........................................................22

U.S.S.G. § 2Bl.1 cmt. (n.3(A)(ii)) ..............20, 21, 23, 24, 28, 40, 42, 44, 45

U.S.S.G. § 2B1.1(b)............................................................................23

U.S.S.G. § 2B1.1(b)(1)...............................21, 22, 23, 24, 28, 31, 35, 38, 45

U.S.S.G. § 2B1.1(b)(1)(L)................................................................9

U.S.S.G. § 2B1.1(b)(14)................................................................34

U.S.S.G. § 2B1.1 cmt. (n.1(E)(iii) ...................................................7

U.S.S.G. § 2B1.1 cmt. (n.1(E)(i) ...............................................20, 21

U.S.S.G. § 2B1.1 cmt. (n.1(E)(ii) ...................................................7

U.S.S.G. § 2B1.1 cmt. (n.1(E)(iii) ...................................................7

U.S.S.G. § 2B1.1, Note 3(F)(i) ....................................................34

U.S.S.G. § 2B1.6 ..........................................................................6

U.S.S.G. § 4B1.2 ........................................................................36

U.S.S.G. § 2B1.1, Commentary, Bkgd ........................................32

## Rules

Fed. R. App. P. 27(d)(2)(A) .........................................................46

Fed. R. App. P. 32(f) ..................................................................46

Fed. R. App. P. 32(g)(1) .............................................................46

## STATEMENT OF SUBJECT-MATTER AND APPELLATE JURISDICTION

This is a direct appeal in a criminal case from the final amended judgment of the United States District Court for the Middle District of Florida, Orlando Division, entered on December 20, 2023. Doc. 172. The district court had jurisdiction pursuant to 18 U.S.C. § 3231.

Mr. Ridling timely filed a notice of appeal on December 29, 2023. Doc. 176. This Court has jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

## STATEMENT OF THE ISSUES

I.   Whether the district court committed reversible error by using "intended loss" to determine "loss" for purposes of the Guideline calculation under U.S.S.G. § 2B1.1.

II.  Whether the district court committed reversible error by determining the "intended loss" to be more than $25 million for purposes of the Guideline calculation under U.S.S.G. § 2B1.1.

## STATEMENT OF THE CASE

## I.  COURSE OF PROCEEDINGS

On November 13, 2019, the government indicted David Ridling with fourteen counts of wire fraud and aiding and abetting, eight counts of illegal monetary transactions and aiding and abetting, and two counts of aggravated identity theft. Docs. 1, 82. Five days later, Mr. Ridling was arrested. *See* docket.

In October 2020, Mr. Ridling pleaded guilty to all counts without a written plea agreement. Docs. 52, 98. At his original sentencing hearing, Mr. Ridling argued that actual loss was the proper metric to calculate loss under § 2B1.1. Doc. 75 at 7. The government argued that "intended loss" was the proper metric to calculate loss. Over defense

counsel's objection, the district court used the "intended loss" calculation in the Presentence Investigation Report (PSR) to determine loss.

In February 2021, the district court sentenced Mr. Ridling to 180 months' imprisonment, followed by three years of supervised release. Docs. 82; 106. Mr. Ridling objected that the sentence was procedurally and substantively unreasonable. Doc. 106 at 45. He appealed and his case was scheduled for oral argument for August 2022. *United States v. David Ridling*, USCA Case No. 21-10777. (11th Cir.).

Following oral argument, this Court issued its opinion vacating Mr. Ridling's sentence and remanding for resentencing with calculation of the actual and intended losses. *United States v. Ridling*, No. 21-10777, 2022 WL 4137723 (11th Cir. Sept. 13, 2022).

On December 18, 2023, the district court completed the resentencing proceedings. Doc. 171–173. Mr. Ridling argued that the proper metric to calculate "loss" under § 2B1.1 at resentencing was "actual loss." Doc. 182. The government argued that "intended loss" was proper. *Id.* The district court found that "intended loss" was proper to determine the appropriate Guideline. *Id.* The district court then

resentenced Mr. Ridling to a downward variance sentence of 108 months' imprisonment followed by 2 years' supervised release. *Id.*

## II. STATEMENT OF THE FACTS

### A. PERSONAL BACKGROUND

David Ridling is a 62-year-old farmer with a dependent wife and two adult children. PSR ¶¶ 30, 133–34. He spent his life working in the farming industry. PSR ¶ 144. He suffers from medical issues including hypertension, diabetes, allergies, and sleep apnea, for which he is prescribed medications. PSR ¶ 136–37. His only prior criminal history was a traffic offense in 2004 for "Drive/Allow Motor Vehicle with No Registration." PSR ¶ 120–21.

### B. FACTS OF THE OFFENSE[1]

For three years, concluding in October 2019, Mr. Ridling devised and executed a scheme to defraud to obtain, and attempt to obtain, money and property from various lenders through materially false

---

[1] The facts in this section of the Initial Brief are excerpts from the portion of the Notice of Maximum Penalties, Elements of Offense, Personalization of Elements, and Factual Basis stipulated to by both parties at Mr. Ridling's plea colloquy. Doc. 51 at 40–54; *see also* Doc. 98 at 2.

pretenses, representations, and promises. Doc. 51 at 40. The scheme included several parts:

First, Mr. Ridling falsely claimed to the lenders that he had millions of dollars in an account at Charles Schwab. *Id.* at 41. For some lenders (Howard Fertilizer, Seaside Bank, AgAmerica, LSBH, Farm Credit of Florida, and Seacoast Bank), Mr. Ridling also falsely represented that he had a joint account at Charles Schwab with his mother that had millions of dollars. *Id.* at 41. In support of those representations, Mr. Ridling provided the lenders with copies of Charles Schwab statements, which he knew were fabricated and false. *Id.* Mr. Ridling's holdings at Charles Schwab during the scheme were less than $2,000. *Id.* at 41. Those misrepresentations induced some lenders into extending loans and lines of credit that would not have been extended had Mr. Ridling represented the true value of his Charles Schwab accounts. *Id.* at 42.

Second, Mr. Ridling impersonated two individuals. *Id.* at 45. In devising and executing his scheme, Mr. Ridling falsely claimed that these two individuals, V.S. and A.S., were his personal account representatives at Charles Schwab. *Id.* at 45. Mr. Ridling used the

email accounts to impersonate V.S. and A.S., without their knowledge to bolster Mr. Ridling's false claims. *Id.* at 45.

Third, Mr. Ridling used false tax returns with some lenders to bolster his false claim that he was wealthy. *Id.* at 48. And fourth, Mr. Ridling used the funds that he obtained from his schemes. *Id.* at 49–51. For example, Mr. Ridling transferred $625,000 from his line of credit fraud proceeds to purchase St. Lucie real property for Blue Cypress Grain, LLC. *Id.* at 53.

After Mr. Ridling executed his scheme to obtain a loan from Seacoast Bank, the FBI learned about that loan. *Id.* at 51. After being contacted by the FBI, Seacoast Bank and others reversed some of the transactions involving the fraudulently obtained funds and froze some of the other proceeds. *Id.* at 51. The United States also seized the bank accounts and personal property that were traceable to fraud proceeds as well as property involved in money laundering. *Id.* at 51.

In November 2019, under a seizure warrant issued by this Court, the United States seized $87,500 in Seacoast Bank fraud proceeds. *Id.* In January 2020, under a seizure warrant issued by the district court, the United States seized a 2017 Chevrolet Silverado, 2006 Peterbilt

Truck, model 379XT, and a 1997 Feather-Lite Trailer bought with line of credit proceeds in the name of Blue Cypress Grain, LLC. *Id.* at 52–53.

### C.    THE PLEA

Mr. Ridling pleaded guilty to all counts without a written plea agreement. Docs. 52, 98.

### D.    THE PRESENTENCE INVESTIGATION

In anticipation of the original sentencing, U.S. Probation prepared a PSR. Doc. 76. The final PSR (filed February 17, 2021) determined a total offense level of 31 under U.S.S.G. § 2B1.1. PSR ¶ 117. Mr. Ridling's lack of prior criminal history placed him in criminal history category I, providing an advisory Guidelines range at sentencing of 108 to 135 months incarceration on Counts 1–22, while Counts 23–24 required a minimum term of imprisonment by statute. PSR ¶¶ 150; U.S.S.G. § 2B1.6.

On remand for resentencing, Mr. Ridling filed an Opposed Motion for Updated PSR. Doc. 158. That request was denied in an endorsed order. Doc. 159.

In the Presentence Report prepared for the initial sentencing hearing, United States Probation calculated "intended loss" as follows:

$12,000,000 to Seaside Bank, $236,905.89 to Howard Fertilizer (goods),

$4,500,000 to Rabo Agrifinance (line of credit), $5,982,287 to

AgAmerica,[2] $15,000,000 to Farm Credit ("attempted loan"),

$15,000,000 to Seacoast Bank (line of credit) for a total of

$52,719,192.89. PSR ¶¶ 96 n.1, 108. And for actual loss: $5,993,952.07

to Seaside Bank,[3] $250,748.60 to Howard Fertilizer (goods), $2,517,655

to Rabo Agrifinance (line of credit), $0 to AgAmerica, $0 to Farm Credit

("attempted loan"), and $2,148,495.76 to Seacoast Bank (line of credit)[4]

for a total of $10,910,851.43.[5] PSR ¶ 98–99.

### E.    THE RESENTENCING HEARING

Prior to the resentencing hearing, Mr. Ridling filed a

Resentencing Memorandum and later a Supplement to Resentencing

---

[2] A credit against loss pursuant to U.S.S.G. § 2B1.1 cmt. (n.1(E)(ii) & (iii)) for "the amount of the fair market value of the collateral. . ." was applied for the "total assessment (for land and improvements) was $9,207,186. . ." PSR at 58.

[3] Of this amount, Traveler's Insurance paid Seaside Bank $2,625,000 of their loss.

[4] The PSR notes that this amount includes "loan closing costs, interest incurred, and legal and consultation fees." PSR ¶ 99. At the resentencing hearing, those amounts were not considered reducing the actual loss to $9,032,083.74.

[5] This sum is adjusted for reasons above. *See* fn.4.

Memorandum. Docs. 152, 166. Both memoranda focused on the proper loss calculation under § 2B1.1, and laid out Mr. Ridling's objections, both factually and legally, to using "intended loss" and to the specific "intended loss" calculation of the government. Doc. 152 at 2–16; Doc. 166 at 2–6. The memoranda argued that legally, "intended loss" should not be applied in calculating the Guidelines, and that factually, Mr. Ridling's "intended loss" was zero. *Id.*

Mr. Ridling's resentencing memoranda argued that the court should sentence him based on actual loss, which would result in a four-level reduction in offense level from that calculated in the PSR. Doc. 152 at 24. He sought a downward variance sentence based on his history and characteristics and other 18 U.S.C. § 3553(a) factors. *Id.* at 24–25. He further argued in his sentencing memoranda that there was not any subjectively "intended loss" because "Mr. Ridling did not purposefully intend to inflict any pecuniary loss on the lenders." *Id.* at 14–16.

At the resentencing hearing, Mr. Ridling again objected to the application of "intended loss" in calculating his Guidelines. Doc. 182 at 5. In doing so, Mr. Ridling relied on the arguments in his resentencing memoranda and made additional arguments. *Id.* at 6–20, 28–29. Mr.

Ridling explained that the difference between the government's "intended loss" calculation and actual loss in this case resulted in a difference of "more than $40 million and four offense levels." *Id.* at 8. Mr. Ridling provided a recent district court order from the Southern District of Florida, *United States v. Patel*, No. 19-CR-80181-RAR, 2023 WL 5453747 (S.D. Fla. Aug. 23, 2023), where the court determined that because "loss" in § 2B1.1 is unambiguous, the court cannot defer to the commentary (sustaining the defendant's objection to the use of "intended loss" in calculating the loss amount). Doc. 166 at 3–4, Doc. 182 at 8–9.

At the resentencing hearing, the district court began by addressing Mr. Ridling's objections related to whether actual loss or "intended loss" should be used to calculate the § 2B1.1(b)(1)(L) guideline. Doc. 182 at 5–6. In determining whether "intended loss" is to be assessed as a measure of loss under § 2B1.1, the district court ruled:

> I'm going to find that the term "loss," as used in 2B1.1 -- I'm going to follow the Sixth Circuit – that for the reasons I just stated, it's not unambiguous, that loss has ambiguity depending on the nature of the offense that a person is committing...

Doc. 182 at 32. In so ruling, the district court then stated that it relied on *United States v. Corker*, No. 22-10192, 2023 WL 1777195 (11th Cir. Feb. 6, 2023) and *United States v. Moss*, 34 F.4th 1176 (11th Cir. 2022). Doc. 182 at 33. The court recapped its ruling as "I've made the ruling that loss is ambiguous."

The district court then moved on to consider the proper loss calculation of actual and intended loss. *Id.* The government called its only witness, Cheryl Patrick. *Id.* Ms. Patrick testified that she was a forensic accountant with the FBI. *Id.* at 35. In this case, she created a timeline of loans that "Mr. Ridling had either obtained or attempted to obtain," including at least one loan that was not alleged as fraudulent. *Id.* at 36. The timeline demonstrated that Mr. Ridling had on multiple occasions used new loan proceeds to pay off previous loans, in whole or in part. *Id.* at 36–37. Ms. Patrick confirmed there were other payments that were not made from subsequent loan proceeds including, at least, an $18,000 payment, and two additional payments for $122,000 in 2017. *Id.* at 40–41, 52–53. Ms. Patrick also found that Mr. Ridling received payments into his account for farming work he had done for U.S. Farming Realty sometime in 2016 or later. *Id.* at 48–49. She further

confirmed that some unknown deposits could be farming income. *Id.* at 49–50, 52.

On cross examination, Ms. Patrick conceded that she had no specialized experience in farm financing, how farm financing was secured, or the cycle of crop financing. *Id.* at 56. She testified that her analysis revealed that $3.6 million was spent on farm expenses. *Id.* at 56, 64. She further determined that $2.8 million was received as farming income in at least two of the accounts, which was then used to pay expenses. *Id.* at 56, 63. She said that her analysis revealed $729,000 that was paid by Mr. Ridling to U.S. Farm Realty Trust for rent on the farmland. *Id.* at 57. She confirmed that when she said regular payments were not made on the loans on direct examination, she had excluded that Mr. Ridling made the interest payments on the loans, which ranged from $1,000 to $13,000. *Id.* at 57–58. Ms. Patrick's analysis revealed expenses of $542,000 spent on fuel, insurance, and otherwise for the upkeep of the Blue Cypress Aviation's airplane. *Id.* at 59. Similarly, she stated she saw payments made towards crop insurance. *Id.* at 61. Ms. Patrick was not aware whether the $1.5 million wire to Valley View for construction of a grain-drying facility

came from loans or elsewhere. *Id.* at 63; *see also* Defense Exh. 13. She admitted, when asked about $277,000 spent on Everglades Farm Equipment, that there were payments made for farming equipment. *Id.* at 63. And she admitted that her analysis related to Everglades Farm Equipment did not reveal that when the FBI investigated that company, that Mr. Ridling's account there was in good standing, he was making regular payments, and that while his balance was $250,000 at the time, none of the balance was past due. *Id.* at 64. She said that she indicated deposits from International Farm Corporation into Mr. Ridling's accounts as "investments" although she knew there was a contract between Mr. Ridling and International Farm Corporation for farm work performed by Mr. Ridling. *Id.* at 65.

Ms. Patrick testified that in all her examination and analysis, no expenses suggested any sort of illicit activity or suggestive of drugs or any other offense. *Id.* at 59. She confirmed that the lines of credit were not completely maxed out by Mr. Ridling, such as the $15 million line of credit from Seacoast Bank where at the max point, only $8 million of the line of credit had been utilized. *Id.* at 59–61.

After her testimony, the district court stated that "there's clearly an ongoing business, an agricultural business of some sort happening" and noted that "there were times when a line of credit was for a much larger amount than was actually drawn." *Id.* at 66, 67.

The government then argued that actual loss should be $5 million higher than it argued at the initial sentencing hearing, but that regardless, the court should find the "intended loss" exceeded $25 million (while also contending that correct calculation of "intended loss" should be $20 million more than it argued that the original sentencing). *Id.* At 71–72.

The court expressed that it understood Mr. Ridling's position that the proper actual loss calculation was $9,032,083.74. *Id.* at 70, 72. The court then asked Mr. Ridling why the "intended loss" was not more than $25 million.

Mr. Ridling explained that, as the government conceded, he repaid many amounts, either through loans or farming income, and that the evidence of farming activity and development, along with repayments, demonstrated that Mr. Ridling's subjective intent was to repay the loans. Mr. Ridling stressed that when one loan was used to pay off a

former loan, there was always transparency between the banks that the subsequent funds were being used for that purpose. *Id.* at 75–76. Additionally, the defense exhibits established that he was farming three crops a year over 6,000 acres. *Id.* at 77; Doc. 175-10 (Defense Exh. 10).

The court indicated that it did not view Mr. Ridling's exhibits, as to the extensive degree of farming operations, land, sales, and consistent interest payments (which was all that had come due) as establishing any intent to repay because, as the court saw it, intent to repay tied to profitability of the farm. *Id.* at 77–78.

Mr. Ridling then argued that Amendment 792 adopted the *United States v. Manatau*, 647 F.3d 1048 (10th Cir. 2011) decision, which held that a subjective inquiry is required when considering "intended loss" under § 2B1.1. Mr. Ridling, referencing the evidence adduced at the resentencing hearing, including the 15 defense sentencing exhibits admitted, argued that "Here, we have tons of evidence that Mr. Ridling was growing this farm, that he was spending millions on the farm, that he was, in fact, farming the farm, that there were crops, that there was insurance." Doc. 182 at 78, *see also* Doc. 182 at 55 (admitting defense exhibits 1–15). The district court then concluded that, "There has to be

some objective truth in the reality of the person who is paying back." Doc. 182 at 79.

Mr. Ridling urged that "ability to repay the loan is not the metric of [Mr. Ridling's] subjective belief." *Id.* Mr. Ridling again referred to the defense sentencing exhibits, which included that Mr. Ridling had paid a $1.5 million deposit on a grain-drying facility, as also reflected in the FBI's electronic records, which was going to be erected at a cost of over $7 million. "Mr. Ridling had a business plan for how he was growing his business. He doubled the acreage of the farm. He paid the deposit to erect the grain facility... He paid all the interest which was due. These were interest payment loans, and he made every single payment of interest." Doc. 182 at 80. Mr. Ridling continued to urge that even though there was fraud in obtaining the loans, he was engaging in all this work of growing this farm by investing over $1 million dollars in farm equipment, and that he was bringing in money by farmwork, including $1.8 million in corn sold to one company. *Id.* at 80–81 (referencing Defense Exh. 5 and 7).

The district court then stated that:

What's he netting, though? What nets is what matters, right? Because if you're talking about subjective ability to

pay, then there should be a tax return showing I made this much money and I'm paying my loans back, you know, along the way, not – because in farming, in particular, the overhead is catastrophic,   which is why it's such a bad business to be in.

And that's why it's all corporate farming these days. The family farm is dead. And that's because it costs so much to buy the grain, to have the land, to deal with the equipment. Most farmers who have thousands of acres are one step away from foreclosure all the time. And they know that.

Doc. 182 at 81. The court concluded that having taken the loans but then "not having turned a profit" could not evince a subjective intent to repay. *Id.*

Mr. Ridling reiterated that the defense exhibits demonstrated he made income from the farm and that "he spent -- and this is in Defense Exhibit 2. He spent half a million dollars on insuring these crops, insuring this farm. . . As the farm grew, he insured the full farm at the cost for one year nearly half a million dollars." Doc. 182 at 82. The district court retorted, "Again, it's net that matters." *Id.*

Mr. Ridling implored that, "We now know this is a tremendous farm that was being farmed, that was being built, that was being developed" and "the PSR states that he was living in a trailer valued at $2,500 during all of this. What we don't see here is any lavish expenses.

We don't see – he's driving a farm truck. He's not driving a Ferrari. We don't see lavish vacations. We don't see any of this sort of indication that he was spending this money other than investing it in the farm, believing that that was going to allow him to build the farm to pay this money back." *Id.* at 84–85. Moreover, "[i]f this was pure fraud, then the money would be spent all over the place. The Government's witness testified that there was no evidence of that." *Id.* at 85.

In summation, Mr. Ridling argued that "It's the Government's burden to prove that his subjective intent was not to pay [the lenders] back, and that's belied by the fact that he was growing this farm, making the interest payments, all the lenders were paid up to date. . . Everything here is consistent with the intent to keep this farm going so that he could pay the money back." *Id.* at 86.

The court stated that, "there was no indication [the business] was producing any money that would justify his subjective belief..." *Id.* at 88. Mr. Ridling then opined that the district court was reading "reasonableness and time limits into determining a subjective belief," to which the court agreed, "[t]here has to be some parameters or it's just the defendant's say-so." *Id.* at 90.

Based on an "intended loss" determination of more than $25 million, the court determined Mr. Ridling's total offense level to be 29 with criminal history category I for a Guidelines range of 87–108 months.[6]

After detailing the 18 U.S.C. § 3553(a) factors, Mr. Ridling argued that a downward variance would provide a sufficient sentence that is not greater than necessary. *Id.* at 99. The government argued that a sentence of eleven years would be most appropriate. *Id.* at 100.

Before the imposition of the sentence, Mr. Ridling allocuted to the court, apologizing and explaining that "I am a first-time and last-time offender." *Id.* at 104. He said that "I truly was trying to build a farm that would sustain time. I did not plan on harming anybody." *Id.* at 108. He urged that this experience humbled him as "I now know what it is like to be considered nothing, to have nothing, and to be treated less than human." *Id.* at 105. He admitted that his "concerns of living through this sentence are real, and I have faced many dangers." *Id.* at 107. And he explained how "it has destroyed my family. My children

---

[6] The total guideline range was two levels lower at the resentencing hearing by application of the retroactive Amendment 821, reducing a zero criminal history point offender's offense level by two levels.

have not spoken to me since sentencing" and "no sentence you could give me today is worse than losing my family." *Id.* at 107–108.

In announcing its sentence, the court explained, "I do appreciate – it's not lost on me that you didn't spend the money on remarkably frivolous things. You're not just, you know, trying to live a lifestyle you can't afford. You were trying to keep a dream alive that was just not going to happen under these circumstances. It's very tough to be a farmer." *Id.* at 110. The court imposed a total sentence of 108 months' incarceration followed by two years' supervised release. *Id.* at 112.

Mr. Ridling objected to the procedural and substantive reasonableness of the sentence and noted his objections "to the calculation of loss in this case." *Id.* at 115.

## III.  STANDARDS OF REVIEW

This Court reviews a district court's interpretation of a sentencing guideline provision de novo and its application of the facts to the sentencing guidelines de novo. *United States v. Mandhai*, 375 F.3d 1243, 1247 (11th Cir. 2004); *United States v. Acuna-Reyna*, 677 F.3d 1282, 1284 (11th Cir. 2012). A district court's findings of fact are reviewed for clear error. *Mandhai*, 375 F.3d at 1247; *United States v.*

*Campbell*, 765 F.3d 1291, 1302 (11th Cir. 2014). When the government seeks to apply a sentencing enhancement over a defendant's objection, the government has the burden of introducing sufficient and reliable evidence to prove the necessary facts by a preponderance of the evidence. *United States v. Washington*, 714 F.3d 1358, 1361 (11th Cir. 2013).

## SUMMARY OF THE ARGUMENTS

I.    The district court erred in determining "loss" under the Sentencing Guidelines, § 2B1.1, by including "intended loss." The district court errantly gave deference to the commentary, specifically, § 2B1.1commentary notes 3(A)(ii) & (E)(i), in determining "loss" where no deference was due. This was error because "loss" in the text of § 2B1.1 is unambiguous, and the commentary is not a reasonable interpretation of the Guideline. By providing deference to the commentary, where none was due, the court reversibly erred by applying a sentencing enhancement for "intended loss" under the Guidelines. To remedy this error, Mr. Ridling's sentence should be vacated and remanded for resentencing without consideration of "intended loss."

II.     Assuming, arguendo, that the district court's deference to commentary notes 3(A)(ii) & (E)(i) in § 2B1.1 in determining "loss" was proper, the district court erred in calculating the "intended loss" to be in excess of $25 million, where the "actual loss" of less than $9.5 million should have been used. Further, the government did not meet its burden of providing reliable and specific evidence to establish that Mr. Ridling subjectively intended nearly $53 million in loss to the lenders. This error impacted the Guidelines calculation by enhancing the sentence an additional four offense levels, rendering the sentence procedurally unreasonable. Mr. Ridling's sentence should be vacated and remanded for a sentencing hearing at which the "loss" is calculated at less than $9.5 million, while the "intended loss" is calculated at zero.

## ARGUMENTS AND CITATIONS OF AUTHORITY

### I.     THE DISTRICT COURT COMMITTED REVERSIBLE ERROR BY USING "INTENDED LOSS" TO DETERMINE "LOSS" FOR PURPOSES OF MR. RIDLING'S GUIDELINE CALCULATION UNDER § 2B1.1.

Except for his two aggravated identity theft counts, Mr. Ridling's counts were grouped for sentencing. PSR ¶¶ 106–07. In a fraud case like this one, to arrive at a base offense level for the grouped counts, Section 2B1.1(b)(1) of the Guidelines requires a defendant's offense level

to be based on the "loss" attributable to that defendant. *United States v. Rodriguez*, 751 F.3d 1244, 1255 (11th Cir. 2014). The government bears the burden of establishing the attributable loss by a preponderance of the evidence. *United States v. Washington*, 714 F.3d 1353, 1361 (11th Cir. 2013).

Here, the text of the fraud guideline directs the district court to increase the base offense level in specific offense characteristics in § 2B1.1(b)(1) based on gradations of economic "loss" measured in dollars. The fraud guideline itself, in Part B of Chapter Two, is titled "Basic Economic Offenses," and refers to theft, embezzlement, receipt of stolen property, property destruction, and offenses involving fraud or deceit. And while it is *expressly* cabined in the "economic" context, the text of § 2B1.1 does not otherwise define "loss." But the Commission does in the commentary to § 2B1.1, over the course of three pages.

The commentary to the Guidelines defines "loss" as the greater of the actual loss or intended loss. § 2B1.1 cmt. (n.3(A)). It explains that "[a]ctual loss" means the "reasonably foreseeable pecuniary harm that resulted from the offense," § 2B1.1 cmt. (n.3(A)(i)), while "[i]ntended loss" is the "pecuniary harm that the defendant purposely sought to

inflict." § 2Bl.1 cmt. (n.3(A)(ii)). The Commission modified the Guidelines definition of "intended loss" in 2015 by Amendment 792 to clarify that it is a subjective inquiry. *See* Amendment 792, U.S. Sent'g Comm'n, (effective Nov. 1, 2015).

At his resentencing hearing, Mr. Ridling objected to the using the commentary's creation of "intended loss" as a metric to calculate his Guidelines, Doc. 152, and particularly to adjust his base offense level in § 2B1.1(b)(1) upward by twenty-two levels. PSR ¶ 108. The district court erred when it "intended loss" to determine the Guidelines specific offense characteristic level enhancement for "loss" under § 2B1.1(b) causing the district court to subsequently err in assessing a 22-level "loss" enhancement under U.S.S.G. § 2B1.1(b)(1) over defense objection, rendering Mr. Ridling's sentence procedurally unreasonable. Mr. Ridling's sentence should be vacated and remanded for a sentencing hearing at which "intended loss" is not considering in assessing "loss" for purposes of his Guideline calculation.

### a. The Commentary to U.S.S.G. § 2B1.1 Improperly Expands the Interpretation of its Unambiguous Sentencing Guideline to include "Intended Loss" as a Metric

Mr. Ridling argued in the district court that the Commission's definition of "intended" loss in Note 3(A)(ii) and its "general rule" in Note 3(A) are plainly inconsistent with the ordinary meaning of "loss" as used in the text of § 2B1.1, that there is no zone of ambiguity large enough to sustain either, and that they constitute an improper exercise of the Commission's authority under *Stinson v. United States*, 508 U.S. 36 (1993), and *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019). Doc. 152 at 2–16; Doc. 166 at 2–6; Doc. 182.

Both the inclusion of an upward adjustment for "intended loss," and the corresponding creation of a "general rule" of operation created and defined by the Sentencing Commission ("Commission") in the commentary to Note 3(A) and 3(A)(ii), are invalid and should be inapplicable to determining the specific offense characteristic level adjustment for "loss" contained in the text of § 2B1.1(b)(1). The Commission created and defined "intended loss" solely in the commentary to U.S.S.G. § 2B1.1. *See* Application Note 3. This resulted in an improper expansion by the Commission of the word "loss" in the text of § 2B1.1 through the commentary.

This expansion through the commentary must be reviewed under the guidance of *Kisor*. Prior to *Kisor*, district and appellate courts gave great deference to the Commission's commentary under *Stinson*, but prior precedent under *Stinson* has now been undermined to the point of abrogation by *Kisor*. *See, e.g., United States v. Riccardi*, 989 F.3d 476, 485 (6th Cir. 2021) ("*Kisor* must awake us 'from our slumber of reflexive deference' to the commentary.") (citation omitted).

In *Stinson,* the Supreme Court held that "commentary in the Guidelines Manual that interprets or explains a [sentencing] guideline is authoritative unless it ... is inconsistent with, or a plainly erroneous reading of, that guideline." *Id*. at 38, 46 (adding that the commentary binds the courts only if the guideline which the commentary interprets will "bear the [amended] construction."). Before *Stinson*, the Supreme Court described the deference that applies to the commentary in *Bowles v. Seminole Rock*, 325 U.S. 410, 414 (1945), and after *Stinson*, in *Auer v. Robbins*, 519 U.S. 452, 461 (1997). This deference is now commonly referred to as "*Auer* deference." *Kisor*, 139 S. Ct. At 2410 (Kagan, J. concurring). Under *Auer* deference, interpretative commentary of a Guideline was binding if it did not "run afoul of the Constitution or a

federal statute, and [if] it is not 'plainly erroneous or inconsistent with' the guideline." *Stinson*, 508 U.S. at 47 (quoting *Seminole Rock*, 325 U.S. at 414).

*Kisor* since clarified when *Auer* deference is appropriate and clarifies the degree of deference owed to an agency's interpretation of its own regulations. In *Kisor*, the Supreme Court held that a district court may not defer to an agency's interpretation of its own regulations unless it first determines, after exhausting all the traditional tools of construction, that the regulation is "genuinely ambiguous." 139 S. Ct. At 2415. "If uncertainty does not exist, there is no plausible reason for deference. The regulation then just means what it means – and the court must give it effect, as the court would any law." *Id.* And even when a regulation is deemed genuinely ambiguous, deference is not automatically applied. *Id.* A court may still only defer to an agency's interpretation of its own regulation that is "within the zone of ambiguity the court has identified after employing all its interpretative tools." *Id.* at 2415–16.

*Kisor* requires that the regulation be "genuinely ambiguous" after "carefully consider[ing] the text, structure, history, and purpose of a

regulation, in all the ways it would if it had no agency to fall back on[;]" and even then, the agency's reading must be "within the zone of ambiguity" the court has identified for it to survive. *Id.* at 2415-16.

*Kisor* revised how deference should be afforded to agency interpretations. *See Riccardi*, 989 F.3d at 486 ("*Kisor*'s limitations on [] deference restrict an agency's power to adopt a new legislative rule under the guise of reinterpreting an old one"); *United States v. Nasir*, 17 F.4th 459, 470-71 (3rd Cir. 2021) (acknowledging having "gone too far" affording binding effect to Commission amendments under *Stinson* that were expansions of textual terms used in the commentary, but recognizing after *Kisor* "it is clear that such [deference] is not warranted."). This is particularly critical where the Commission frequently – as with its changes to the definition of "loss" in § 2B1.1 between 1987 and 2015 – amended guidelines through the commentary rather than directly in the text, because the latter is subject to Congressional review and the former is not. *See United States v. Havis*, 927 F.3d 382, 385-86 (6th Cir. 2019) (stating that "[u]nlike the Guidelines themselves, [] commentary to the Guidelines never passes

through the gauntlets of congressional review or notice and comment[]").

Where commentary amendments have the same force and effect as textual amendments, and where they result in years more prison time – as precisely in this case with Mr. Ridling, where the "intended loss" calculation surpasses the "actual loss" calculation by more than $40 million dollars and four additional guideline offense levels – there follows a violation of the separation of powers and due process.

Section § 2B1.1(b)(1) itself makes no distinction between actual and "intended loss." This critical distinction in many cases, like Mr. Ridling's, arises only within the guidelines' commentary. Under *Kisor*, "intended loss" can only be applied if "loss" is genuinely ambiguous. Here, the district court erred in determining that loss is genuinely ambiguous.

Specifically, in Application Note 3 the Commission provides that "[t]his application note applies to the determination of loss under subsection (b)(1)." Under Note 3(A), the Commission states it is a "general rule" that "loss is the greater of actual loss or intended loss." And at Note 3(A)(ii), the Commission defines "intended" loss as "(I) []

the pecuniary harm that the defendant purposely sought to inflict; and (II) includes intended pecuniary harm that would have been impossible or unlikely to occur[.]" *See* § 2B1.1, App. Note 3. This definition of "intended loss" (much less the application of the "general rule") is so far removed from any plain reading or operation of the term "loss" in the economic context of § 2B1.1, that no reasonable person would define it this way. This definition is thus novel, inconsistent, plainly erroneous, and violates the separation of powers and due process.[7]

In the economic context – as the word "loss" is titled and used in § 2B1.1 – "loss" is specific and directed at the victim's monetary loss (which the text of § 2B1.1 accordingly refers to at subsection (b)(1) in dollar amounts). The Sixth Circuit in *Riccardi* looked at a different commentary note in § 2B1.1 but provided multiple dictionary

---

[7] The Sentencing Reform Act of 1984 tasked the Commission with creating "guidelines" that contain sentencing ranges for various categories of offenses. 28 U.S.C. § 994(a)(1), (b)(1); *Stinson v. United States*, 508 U.S. 36, 40-41, 113 S. Ct. 1913 (1993). These administratively adopted guidelines affect individual liberties because Congress required district courts to follow them when determining the length of a defendant's prison term. 18 U.S.C. § 3553(b)(1); *United States v. Havis*, 927 F.3d 382, 385-86 (6th Cir. 2019) (*en banc*) (*per curiam*).

definitions for "loss." *Riccardi*, 989 F.3d. at 486; *see also United States v. Kirilyuk*, 29 F.4th 1128, 1136–38 (9th Cir. 2022). *Riccardi* then provided dictionary definitions of "loss" in the economic context - stating that "in the economic realm, the word might cover only the precise value of, say, a gift card that is stolen (the 'amount of something lost')[] ... '[o]r it might include the costs associated with obtaining a replacement gift card, including the time and expense from a second trip to the store ('the damage, trouble, disadvantage [or] deprivation ... caused by losing something')[.]" *Id.* (dictionary citations omitted).

In all the definitions explored in *Riccardi*, while there may be some ambiguity that exists depending on the context of how the word "loss" is used, it determined that there is no zone of ambiguity from which "loss" is defined as the harm intended by the perpetrator. In all the contexts of the definition, particularly in the economic context, "loss" invariably is focused on the harm *suffered by the victim*. There is no definition available for considering the plain and ordinary meaning of "loss" that focuses on the subjective intent of the perpetrator to cause harm to the victim. Thus, the plain meaning of the word "loss" in the

text of § 2B1.1 refers to victim losses in terms of dollars. There is no ambiguity there, particularly in the economic context relevant here.

This means that the Commission is not engaged in interpretation when it defines "loss" in this inconsistent and novel way. And this also is particularly apt in cases like the instant one, because whatever the source, the word "loss" is not defined in any dictionary, much less in the economic context, as the amount of loss intended by the perpetrator *whether or not it arose.*

The § 2B1.1 guideline cannot hold this definition, as no reasonable interpretation of the word "loss" supports the Commission's expansive "intended loss" definition or "general rule" requiring that the specific offense characteristic § 2B1.1(b)(1) be adjusted by substituting the defendant's intent to cause loss whenever such is larger in monetary value – even where there is no "actual loss" to a victim at all (such as here, for example with Farm Credit's $15 million "intended loss" for an "attempted loan" in Mr. Ridling's PSR). The "ordinary and customary meaning" of "loss" is what a person actually lost, not what some other person intended them to lose.

This shows that the Commission's creation of the term "intended loss" and its accompanying definition, focusing on the intent of the defendant, as well as its "general rule" requiring the defendant's unrealized subjective intent to apply in the absence of any (or any greater) loss by the victim, is a substantive policy choice, from which the Commission sought to cover (far beyond the ordinary meaning of the word "loss" in § 2B1.1) instances where the victim suffered no loss (or less loss) in the traditional economic sense despite the defendant's intent to potentially cause the victim loss (or greater loss than what materialized).

The Commission has determined, as a matter of policy, that the traditional notion of "loss" in the text of § 2B1.1 – as it pertains to victim loss – is not sufficient, and that a deeper assessment of offender culpability is necessary to ensure the best sentencing outcomes. *See* § 2B1.1, Commentary, Bkgd. ("loss serves as a measure of the seriousness of the offense and the defendant's relative culpability and is a principal factor in determining the offense level under this guideline[]").

There is a scenario where the Commission's "intended loss"
definition would be acceptable, no matter how plainly erroneous and
inconsistent with the meaning of the word "loss" as used in economic
context and the text of § 2B1.1; that is, to be valid and constitutional
the Commission must simply put "intended loss" into the text of the
Guideline, not through an expansion in the commentary, to allow for
the requisite comment and Congressional review. *See, e.g., United
States v. Tejas*, 868 F.3d 1242, 1245-46 (11th Cir. 2017) (holding that
"special rule" in Application Note 4 of § 2B1.1's commentary requiring
assessment for 10 or more victims was invalid as to defendant who stole
a single postal item because the commentary was "inconsistent with the
plain text of the guideline[]" and produced "erroneous and contrary
results" despite Commission's purpose of protecting the U.S. mail –
stressing "despite the importance of this goal, [the Commission] cannot
trump the plain text of the guideline[]"); *United States v. Winstead*, 890
F.3d 1082, 1092 (D.C. Cir. 2018) (reasoning that *Stinson* does not allow
the Commission "to invoke its general interpretive authority via
commentary. . . to impose such a massive impact on a defendant with
no grounding in the guidelines themselves[]" and explaining that "[i]f

the Commission wishes to expand the definition of 'controlled substances offenses' to include attempts, it may seek to amend the language of the guidelines [text] by submitting the change for congressional review."); *Riccardi*, 989 F.3d at 487 (stating "if the Commission seeks to keep individuals behind bars for longer periods of time based on this type of 'fictional' loss amount[] [in § 2B1.1, Note 3(F)(i)], this substantive policy decision belongs in the guidelines, not in the commentary.") (citations omitted); *Nasir*, 17 F.4th at 471–72 (holding the commentary authorizing enhancements of attempts and conspiracies to commit controlled substance offenses is invalid because unambiguous text of Guideline does not mention same, stating that the degree of deference after *Kisor* is now "context dependent[]" and the "interpretation of regulations ultimately 'remains in the hands of the courts[]'"). The Commission knows how to do this and has done so in the fraud guideline; as in § 2B1.1(b)(14) where the plain text of the guideline directs a specific offense characteristic to account for what "the defendant knew or intended" to result in misappropriation of trade secret cases.

Thus, the Commission has amended and expanded the meaning of the word "loss" contained in the text of § 2B1.1 through the commentary, by creating "intended loss" and a "general rule" authorizing a sentencing enhancement based on the defendant's intent, which is so novel, inconsistent, plainly erroneous, and unreasonable in relation to the ordinary victim-centered meaning of the word "loss" in the economic context, that it is not sustainable without Congressional review. This is particularly evident in Mr. Ridling's case, where there is no victim-related economic loss at all as to at least one victim, Farm Credit as no loan was ever written, yet $15 million was assessed under the guidelines as "intended loss," and where the commentary's "intended loss" and "general rule" operate to increase Mr. Ridling's base offense level under § 2B1.1(b)(1) by twenty-two offense levels, based on what Mr. Ridling allegedly "intended" the victims' monetary losses to be, rather than what they were.

This specific argument does not appear to have been raised and resolved before the Eleventh Circuit since *Stinson* or *Kisor*. Nevertheless, in *United States v. Dupree*, 57 F.4th 1269, 1277 (11th Cir. 2023) (en banc), the Eleventh Circuit considered whether, with *Kisor*'s

refined deference scheme in mind, it should defer to the commentary in the Guidelines to supplement § 4B1.2's definition of "controlled substance offense" to include inchoate offenses. After applying the traditional tools of statutory interpretation, the Court held that the plain language definition of "controlled substance offense" in § 4B1.2 unambiguously excluded inchoate offenses because the Guideline commentary cannot expand the interpretation of an unambiguous Sentencing Guideline. *Id.* The Court stated that "[u]nder *Kisor*, [an unambiguous Sentencing Guideline] concludes our analysis, and we have no need to consider, much less defer to, the commentary" in the application notes. *Id.* at 1279. *Dupree*, by permitting deference to the commentary for only "genuinely ambiguous" Guidelines, *id.* at 1274, held that the part of *Stinson* requiring commentary deference for unambiguous Guidelines had been overruled.[8] *Id.* at 1284 (Grant, J., concurring in judgment). The same analysis must now apply to § 2B1.1 "loss" -- that is, there is no deference to the commentary as the Guideline is clear on its own under *Dupree* and because its commentary is obviously wrong (*Stinson*).

---

[8] *Dupree* held that the Supreme Court had, in part, overruled Stinson, by implication in *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019).

The Third Circuit undertook that same analysis, considering "intended loss" in *United States v. Banks*, 55 F.4d 246, 258 (3d Cir. 2022). In *Banks*, the Third Circuit held that in the absence of Guideline text extending "loss" to "intended loss," § 2B1.1's "loss" reaches only actual loss. *Id.* The defendant in *Banks* had attempted to make hundreds of thousands of dollars' worth of fraudulent deposits into and withdrawals from an international exchange system, but he was unsuccessful. *Id.* at 251. The district court, in reliance on the application notes to § 2B1.1 applied the enhancement based on the amount of money Banks had intended (attempted) to withdraw from the exchange. *Id.* at 253. On appeal, in view of *Kisor*, 139 S. Ct. 2400, the Third Circuit reversed *Banks*, holding that the application notes were not entitled to the deference the district court accorded them because the plain text of § 2B1.1 controlled. *Id.* at 255–57. Because the "ordinary meaning of 'loss' in the context of § 2B1.1 is 'actual loss,'" the Third Circuit remanded the case for resentencing. *Id.* at 257–58. There is nothing ambiguous about the meaning of "loss" in § 2B1.1, and no indication that loss means anything other than actual loss. Thus, the district court erred in concluding otherwise here, which then errantly

led to its deference of loss as "intended loss" in the commentary. This Court should determine, as the Third Circuit, that "[b]ecause the commentary expands the definition of 'loss' by explaining that generally 'loss is the greater of actual loss or intended loss,'" it should be "afforded no weight." *Id.*

More recently, in *United States v. Patel*, No. 19-CR-80181-RAR, 2023 WL 5453747, at *1–3 (S.D. Fla. Aug. 23, 2023), a case from the Southern District of Florida in this Circuit, the district court effectively adopted *Banks* by holding that courts "cannot consider" the commentary to interpret § 2B1.1(b)(1) because the commentary "expands the concept of 'loss' beyond its ordinary meaning." *United States v. Patel*.

### b. The Commentary to U.S.S.G. § 2B1.1 is Not a Reasonable Interpretation of the Guideline

Although Mr. Ridling strenuously maintains that loss is not unambiguous, even if "loss" was genuinely ambiguous, inter alia, Mr. Ridling argues that the district court must disregard the commentary as to "intended loss" because it is not a reasonable interpretation of the Guideline. In *Kisor*, the Supreme Court found that:

> If genuine ambiguity remains, . . . the agency's reading must still be 'reasonable.' In other words, it must come within the zone of ambiguity the court has identified after employing all

its interpretative tools. And let there be no mistake: That is a requirement an agency can fail.

139 S. Ct. 2415–16 (internal citation omitted).

In addition to his arguments above, Mr. Ridling submits that the Commission's inclusion of "intended loss" impermissibly expanded the plain meaning of "loss" in the Guideline and thus it is an unreasonable interpretation of loss. Consider, for instance, Mr. Ridling's assessed "intended loss" of $15 million for an "attempted loan." No ordinary interpretation of plain language would bear the weight that a "loss exceeded $6,500" (the beginning of the Guideline's economic threshold) when pecuniary harm resulting from an unsuccessful "attempted" loan was impossible. Thus, even if ambiguity exists as to the meaning of "loss" in § 2B1.1 (and it does not, as argued above), the commentary's inclusion of "intended loss" is far outside the zone of that ambiguity. Because the commentary is an unreasonable interpretation of loss, it should not have been afforded deference, and thus, should not have been used to determine Mr. Ridling's Guideline.

For the above reasons, considering *Kisor, Dupree,* and *Bank*s, the district court erred in considering "intended loss" as a metric for loss

under § 2B1.1 when it determined Mr. Ridling's guideline calculation.

*Id.*

**II.  THE DISTRICT COURT COMMITTED REVERSIBLE ERROR IN CALCULATING THE "INTENDED LOSS" TOTAL TO BE MORE THAN $25 MILLION UNDER U.S.S.G. § 2B1.1.**

While Mr. Ridling urges that "intended loss" was not an appropriate metric to determine loss under the Guidelines, *see* Section I. Mr. Ridling also argued in the lower court that the proper calculation of "intended loss" in his case should be calculated at $0.

The district court erred when it assessed an "intended loss" more than $25 million (nearly $53 million[9]) based on the total assessed sum of loans, lines of credit, and goods sought or applied for—no matter if the loans were approved, used, or dispersed to Mr. Ridling. *See* § 2Bl.1 cmt. (n.3(A)(ii)). This assessment of loss exceeding $25 million increased

---

[9] Mr. Ridling's PSR calculated the "intended loss" to be $52,719,192.89: The intended loss was calculated based on the loans and/or attempted loans, specifically: $12,000,000 to Seaside Bank; $236,905.89 in fronted goods from Howard Fertilizer; $4,500,000 in lines of credit from Rabo Agrifinance; $5,982,287 from AgAmerica; a $15,000,000 attempted loan from Farm Credit; and a $15,000,000 line of credit from Seacoast Bank. This results in a total intended loss of $52,719,192.89.
PSR ¶ 96 n.1.

Mr. Ridling's Guidelines range more than his alternative actual loss calculation of slightly less than $9.5 million would have by four additional levels. And compounding that, Mr. Ridling subjectively intended no loss.

A defendant's intent is often difficult to prove and often must be inferred from circumstantial evidence. *See United States v. Ethridge*, 948 F.2d 1215, 1217 (11th Cir. 1991) (recognizing that intent must often be proved by circumstantial evidence allowing the factfinder to infer intent); *Hill v. Kemp*, 833 F.2d 927, 930 (11th Cir. 1987) (approving jury instruction that "[i]ntent may be shown in many ways … It may be inferred from the proven circumstances or by acts and conduct …").

It is against this backdrop that this Court must consider whether the district court erred in its calculation of "intended loss" when it assessed a 22-level enhancement to Mr. Ridling's guideline range following an "intended loss" calculation more than $25 million.

Mr. Ridling was a lifelong farmer. On encountering financial trouble, he took a series of loans and lines of credit intending that "the loans would be repaid and no one would suffer losses." Doc. 75 at 5; *see also* Docs. 75 at 1–2, 4, 6–8; 106 at 5–6. Where there is evidence of

subjective intent to repay the loans, actual loss should be used, not "intended loss." Application Note 3(A)(ii) to U.S.S.G. § 2B1.1 defines "intended loss" as that "pecuniary harm that the defendant purposely sought to inflict . . ." Here, Mr. Ridling was trying to build a farm and not to inflict loss for many reasons, including that his farm depended upon the infusion of capital that farmers routinely borrow from banks to keep the cycle of the farm economy going. Mr. Ridling's incentives and actions evince an intent to repay the loans. *See* Docs. 152, 166, 182, 175 (Resentencing Exhibits).

To begin, Mr. Ridling made payments on the loans and other substantial payments that are reflected to: fertilizer companies, equipment companies, vehicle manufacturers, Everglade Farm Equipment, John Deere, J & J Ag Products, Chemical Containers, Northern Tool Equipment, and Mustang Machines, fertilizer, crop insurance, and so on. *See* Doc. 175 (Defense Resentencing Exhibits). Additionally, he bought and leased land and purchased crop insurance (and following the hurricanes remitted its proceeds to one of the lenders). *Id.*

These actions show that Mr. Ridling viewed his business as a legitimate venture and his actions evince his intent not to purposely inflict pecuniary harm. Mr. Ridling's actions show, and he explained in his allocution that he genuinely, subjectively believed he would repay the funds. *See* Doc. 182, 175 (Defense Resentencing Exhibits). Further, Mr. Ridling maintained a personal stake in the farm's success, and he was always upfront that he was the borrower and had other loans. The uncontested purchase of crop insurance purchase also shows that Mr. Ridling viewed his business as a legitimate venture and never intended to purposely inflict pecuniary harm on the lenders a total loss of $53 million. Thus, as Mr. Ridling did not purposefully intend to inflict any pecuniary loss on the lenders, there is no subjective "intended loss." And the government, who maintained the burden to prove otherwise, did not provide specific and reliable evidence otherwise.

When considering a defendant's intent to inflict pecuniary loss, the calculation on "intended loss" can be reduced to as little as $0 in accord with the defendant's subjective intent. In *United States v. Tatum*, 138 F.3d 1344 (11th Cir. 1998), this Court determined that it was error to treat the gross amount of the contract price as the loss, without

offsetting for the defendant's intent to perform services under the contract and suggested that after the offset of value there might be no loss for guideline purposes. That equally applies here and the determination of Mr. Ridling's "intended loss" should be zero. *See* Docs. 152, 166, 182, 175 (Resentencing Exhibits).

Mr. Ridling argued throughout the resentencing proceedings that, while "intended loss" is not an appropriate metric, *see* supra, that if the district court determined it was, his "intended loss" should be determined to be zero. *See* Docs. 152 (resentencing memorandum), 166 (supplement), 182 (sentencing transcript). But in deciding the issue, the district court agreed with the government and overruled Mr. Ridling's subjective "intended loss" calculation objections, reading limitations into the subjective inquiry. Doc. 182 at 80–90.

The Guidelines instruct that the district court must determine the loss under the *subjective* inquiry of "harm that the defendant purposely sought to inflict." *See* § 2Bl.1 cmt. (n.3(A)(ii)). Further, "intended loss" must be proven by the government. Here, the government failed to produce reliable, specific evidence that Mr. Ridling "purposely sought to inflict" nearly $53 million in losses.

To establish that Mr. Ridling *intended* a nearly $53 million loss, it was necessary for the government to show that Mr. Ridling believed that $53 million would not be repaid and therefore he purposely sought to inflict that loss. § 2Bl.1 cmt. (n.3(A)(ii)). Inclusion of the full loan amount in the loss calculation is appropriate only when the facts reveal the defendant intended a loss with respect to the face value of the securities at issue. *See United States v. Hill*, 42 F.3d 914 (5th Cir. 1995); *United States v. Tedder*, 81 F.3d 549, 551 (5th Cir. 1996). Here, there was not "reliable and specific evidence" to demonstrate that Mr. Ridling intended to inflict a loss equal to the total value of the funds that he sought for his farm. *See Greene*, 279 F. App'x at 908; *Liss*, 265 F.3d at 1230.

The district court failed to properly apply the Sentencing Guideline when it applied the "intended loss" enhancement under U.S.S.G.§ 2B1.1(b)(1), over defense objection, rendering Mr. Ridling's sentence procedurally unreasonable. Mr. Ridling's sentence should be vacated and remanded for a resentencing hearing at which his subjective "intended loss" is calculated as zero.

## CONCLUSION

For the above reasons, Mr. Ridling respectfully requests that this Court vacate his sentence and remand the case with appropriate instructions.

Respectfully submitted,

*/s/ Michelle R. Yard*
Michelle R. Yard, BCS
Joshi Law Firm, P.A.
Fla. Bar No. 14085
5750 Major Blvd, Suite 530
Orlando, FL 32819
Telephone: (407) 661-1109
Email: michelle@joshi.law
Attorney for Appellant

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**

In accordance with Fed. R. App. P. 32(g)(1), I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A) because this brief contains 9,115 words according to Microsoft Word's word count, excluding the parts of the motion exempted by Fed. R. App. P. 32(f).

/s/ Michelle R. Yard
Michelle R. Yard, BCS
Attorney for Appellant

**CERTIFICATE OF SERVICE**

I hereby certify that on this 6th day of May 2024, a true copy of this *Initial Brief of Appellant* was filed using the Court's Electronic Case Filing system, which will send notification to Holly L. Gershow, Assistant United States Attorney. I also certify that on May 6th, 2024, the above documents were sent via FedEx to the Clerk, United States Court of Appeals, Eleventh Circuit, 56 Forsyth Street, N.W., Atlanta, GA 30303.

/s/ Michelle R. Yard
Michelle R. Yard, BCS
Attorney for Appellant